**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF INDIANA**

| | |
|---|---|
| ERIC WESTON, individually and on behalf of all others similarly situated, | Case No. 1:17-cv-1883 |
| *Plaintiff*, | **COMPLAINT** |
| | **CLASS ACTION** |
| *v.* | **DEMAND FOR JURY TRIAL** |
| BIG SKY CONFERENCE, INC., a Utah non-profit corporation, and NATIONAL COLLEGIATE ATHLETIC ASSOCIATION, | |
| *Defendants.* | |

## CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff Eric Weston brings this Class Action Complaint and Demand for Jury Trial against Defendants Big Sky Conference, Inc. and National Collegiate Athletic Association ("NCAA") to obtain redress for all persons injured by their reckless disregard for the health and safety of generations of Weber State University student-athletes. Plaintiff alleges as follows upon personal knowledge as to himself and his own acts and experiences and, as to all other matters, upon information and belief, including investigation conducted by his attorneys.

## INTRODUCTION

1.     Nearly one hundred thousand student-athletes sign up to compete in college football each year and it's no surprise why. Football is America's sport and Plaintiff and a Class of football players (defined below) were raised to live and breathe the game. During football season, there are entire days of the week that millions of Americans dedicate to watching the game. On game days, hundreds of thousands of fans fill stadium seats and even more watch around the world. Before each game, these players—often mere teenagers—are riled up and told to do whatever it takes to win and, when playing, are motivated to do whatever it takes to keep

going.

2.     But up until 2010, Defendants Big Sky and NCAA kept players and the public in the dark about an epidemic that was slowly killing college athletes.

3.     During the course of a college football season, athletes absorb more than 1,000 impacts greater than 10g's (gravitational force) and, worse yet, the majority of football-related hits to the head exceed 20g's, with some approaching 100g's. To put this in perspective, if you drove your car into a wall at twenty-five miles per hour and you weren't wearing a seatbelt, the force of you hitting the windshield would be around 100g's. That means each season these 18, 19, and 20 year old student-athletes are being subjected to the equivalent of several hundred car accidents.

4.     Over time, the repetitive and violent impacts to players' heads led to repeated concussions that severely increased their risks of long term brain injuries, including memory loss, dementia, depression, Chronic Traumatic Encephalopathy ("CTE"), Parkinson's disease, and other related symptoms. Meaning, long after they played their last game, they are left with a series of neurological events that could slowly strangle their brains.

5.     Unfortunately, for decades, Defendants knew about the debilitating long-term dangers of concussions, concussion-related injuries, and sub-concussive injuries (referred to as "traumatic brain injuries" or "TBIs") that resulted from playing college football, but recklessly ignored this information to protect the very profitable business of "amateur" college football.

6.     While in school, Weber State football players were under Defendants' care. But Defendants did not care about the off-field consequences that would haunt their students for the rest of their lives.

7.     Despite knowing for decades of a vast body of scientific research describing the

2

danger of TBIs, Defendants failed to implement procedures to protect Plaintiff and other Weber State football players from the long-term dangers associated with them.

8.     As a direct result of Defendants' actions (or lack thereof), Plaintiff and a Class of former players (defined below) now suffer from neurological and cognitive damage, including symptoms of traumatic encephalopathy.

## PARTIES

9.     Plaintiff Eric Weston is a natural person and citizen of the State of Idaho.

10.     Defendant Big Sky is a non-profit corporation organized and existing under the laws of the State of Utah, with its principal place of business located at 2491 Washington Boulevard, Ogden, Utah 84401. Defendant Big Sky conducts business throughout this District, the State of Indiana, and the United States.

11.     Defendant NCAA is an unincorporated association with its principal place of business located at 700 West Washington Street, Indianapolis, Indiana 46206. Defendant NCAA is not organized under the laws of any State, but is registered as a tax-exempt organization with the Internal Revenue Service. As such, Defendant NCAA is a citizen of the State of Indiana pursuant to 28 U.S.C. 1332(d)(10). Defendant NCAA conducts business throughout this District, the State of Indiana, and the United States.

## JURISDICTION AND VENUE

12.     This Court has subject matter jurisdiction over this case under 28 U.S.C. § 1332(d)(2) because (a) at least one member of the Class, which consists of at least 100 members, is a citizen of a state different from Defendants, (b) the amount in controversy exceeds $5,000,000, exclusive of interest and costs, and (c) none of the exceptions under that subsection apply to this action.

13. This Court has personal jurisdiction over Defendants because they conduct significant business in this District, including establishing consumer and business contracts here and because the unlawful conduct alleged in the Complaint occurred in, was directed at, and/or emanated in part from this District.

14. Venue is proper in this district pursuant to 28 U.S.C. § 1391 because a substantial part of the events giving rise to Plaintiff's claims occurred in and/or emanated from this District and because Defendant NCAA resides here.

## FACTUAL BACKGROUND

### I. Defendants Big Sky and NCAA Had a Duty to Protect Their Student-Athletes.

15. Defendant NCAA is the governing body of collegiate athletics that oversees twenty-three college sports and over 400,000 students who participate in intercollegiate athletics, including in the Big Sky, and the football program at Weber State. According to the NCAA, "[m]ore than 1,200 schools, conferences, and affiliate organizations collectively invest in improving the experiences of student-athletes – on the field, in the classroom, and in life."[1]

16. To accommodate the wide spectrum of student-athletes at its member schools, the NCAA has three different divisions of intercollegiate competition. Division I is the highest level of intercollegiate athletes sanctioned by the NCAA and includes many well-known schools, with high ranking teams, larger budgets, better facilities, and more athletics scholarships.

17. Each NCAA Division is composed of several "conferences" to facilitate regional league play. One such conference is Defendant Big Sky. In furtherance of this commitment, Big Sky promulgates rules, handbooks, and regulations for its member organizations in order to

---

[1] Membership, *National Collegiate Athletic Association*, http://www.ncaa.org/about/who-we-are/membership (last visited June 8, 17).

regulate its member institutions athletic departments. Each member institution, and each of the member institution's athletes, agree to abide by the rules and regulations issued by the NCAA and Big Sky. Weber State is a member of Big Sky for its football program.

18.     The Weber State football program has a strong following that is watched by thousands of individuals each game and generates millions of dollars per year for the school. Given its significant following and numerous on-field successes, Weber State's football team attracts top talent from high schools around the country.

19.     Collectively, Defendants govern and regulate the Weber State football program and owe a duty of care to safeguarding the well-being of its student-athletes.

20.     In fact, since its founding in 1906, the NCAA (then the Intercollegiate Athletic Association of the United States ("IAAUS")), has claimed to be "dedicated to safeguarding the well-being of student-athletes and equipping them with the skills to succeed on the playing field, in the classroom and throughout life."[2] The IAAUS was specifically formed for this purpose because, at the turn of the 20th Century, head injuries were occurring at an alarming rate in college football. In response, President Theodore Roosevelt convened a group of Ivy League university presidents and coaches to discuss how the game could be made safer. After several subsequent meetings of colleges, the association was established.[3] As such, the genesis of the NCAA was a singular goal: safe-guarding the health and safety of student-athletes.

21.     According to the NCAA, "[c]ollege and university presidents and chancellors guide each division, supported by an extensive committee structure guided by athletic administrators, faculty and student-athlete representatives[, but that each] division creates its

---

[2]     About the NCAA, *National Collegiate Athletic Association*, http://www.ncaa.org/about (last visited June 8, 17).
[3]     In 1910, the IAAUS changed its name to the National Collegiate Athletic Association.

own rules that follow the overarching principles of the NCAA."[4]

22.     The overarching principles of the NCAA, including its purported commitment to safeguarding its student-athletes, are contained in the NCAA Constitution. The NCAA Constitution clearly defines the NCAA's purpose and fundamental policies to include maintaining control over and responsibility for intercollegiate sports and student-athletes. The NCAA Constitution states in pertinent part:

> The purposes of this Association are:
>
> (a)  To initiate, stimulate and improve intercollegiate athletics programs for student-athletes;
>
> (b)  To uphold the principal of *institutional control* of, and responsibility for, all intercollegiate sports in conformity with the constitution and bylaws of this association;

NCAA Const., Art. 1, § 1.2(a)(b) (emphasis added).

23.     The NCAA Constitution also defines one of its "Fundamental Policies" as the requirement that "Member institutions shall be obligated to apply and enforce this legislation, and the enforcement procedures of the Association shall be applied to an institution when it fails to fulfill this obligation." NCAA Const., Art. 1, § 1.3.2.

24.     Article 2.2 of the NCAA Constitution specifically governs the "Principle of Student-Athlete Well-Being," and provides:

> **2.2 The Principle of Student-Athlete Well-Being.**
>
> Intercollegiate athletics programs shall be conducted in a manner designed to protect and enhance the physical and educational well-being of student athletes. (Revised: 11/21/05.)
>
> **2.2.3 Health and Safety.**

---

[4]     Membership, *National Collegiate Athletic Association*, http://www.ncaa.org/about/who-we-are/membership (last visited June 8, 17).

> It is the responsibility of each member institution to protect the health of, and provide a safe environment for, each of its participating student athletes. (Adopted: 1/10/95.)

25.     To accomplish this purported purpose, the NCAA promulgates and implements standard sport regulations and requirements, such as the NCAA Constitution, Operating Bylaws, and Administrative Bylaws. These NCAA documents provide detailed instructions on game and practice rules, player eligibility, scholarships, and player well-being and safety. NCAA member institutions, including athletic conferences like Big Sky, are required to abide by the NCAA rules and requirements. Specifically, according to the NCAA Constitution: "Each institution shall comply with all applicable rules and regulations of the Association in the conduct of its intercollegiate athletics programs . . . Members of an institution's staff, student-athletes, and other individuals and groups representing the institution's athletics interests shall comply with the applicable Association rules, and the member institution shall be responsible for such compliance." NCAA Const., Art. 2, § 2.8.1.

26.     The NCAA publishes a health and safety guide called the Sports Medicine Handbook (the "Handbook"). The Handbook, which is produced annually, includes the NCAA's official policies and guidelines for the treatment and prevention of sports-related injuries, as well as return-to-play guidelines, and recognizes that "student-athletes rightfully assume that those who sponsor intercollegiate athletics have taken reasonable precautions to minimize the risk of injury from athletics participation."[5]

27.     To provide member institutions with the tools that they need to comply with

---

[5]     *See*, *e.g.*, David Klossner, *2013-14 NCAA Sports Medicine Handbook*, NATIONAL COLLEGIATE ATHLETIC ASSOCIATION (Aug. 2013), *available at* https://www.ncaa.org/sites/default/files/2013-14%20Sports%20Medicine%20Handbook.pdf.

NCAA legislation, the NCAA Constitution promises that the "Association shall assist the institution in its efforts to achieve full compliance with all rules and regulations. . . ." NCAA Const., Art. 2, § 2.8.2.

28. Likewise, according to the NCAA Constitution, a member conference is entitled to all of the privileges of active members, except the right to compete in NCAA championships. *See* NCAA Const., Art. 3, § 3.02.3.2. Member "conferences of [the NCAA] agree to administer their athletics programs in accordance with the constitution, bylaws and other legislation of the Association." NCAA Const., Art. 3, § 3.3.4.1.

29. The NCAA, therefore, holds itself out as both a proponent of and authority on the treatment and prevention of sports-related injuries upon which the student-athletes, Big Sky, and Weber State (*i.e.*, a member institution) can rely for guidance on player-safety issues.

30. As a member conference, Big Sky was charged with implementing and enforcing those guidelines in a meaningful way to protect the health and safety of Weber State football players, including Plaintiff.

31. As a member of the NCAA, Big Sky was obligated to help protect the health and safety of its student-athletes and agreed to abide by the NCAA Constitution.

32. As compared to Plaintiff and other Weber State football players, the Defendants were in superior positions to know of and mitigate the risks of concussions and other TBIs.

**II.    Decades of Studies Firmly Establish the Dangers Associated with Football-Related Concussions.**

33. Throughout the twentieth century and into the twenty-first century, studies have firmly established that repetitive and violent impacts to the head can cause concussions with a heightened risk of long term traumatic brain injuries (or TBI), including memory loss, dementia, depression, CTE, Alzheimer's disease, Parkinson's disease, and other related symptoms. To

better understand the results of these studies, a brief introduction to concussions in football follows.

        *A.*      *An Overview of Concussions in Football.*

34.      A concussion is a traumatic brain injury caused by an impact that causes the head and brain to move rapidly back and forth. The movement causes the brain to bounce around or twist in the skull, damaging brain cells and creating chemical changes in the brain.

35.      The human brain is made of soft tissue, cushioned by spinal fluid, and encased in a hard skull. During everyday activity, the spinal fluid protects the brain from crashing against the skull. But relatively minor impacts—including not only direct blows to the head but also blows to the body and movements that cause the neck to whiplash—can move the brain enough to press through the spinal fluid, knock against the inside of the skull, and cause concussions.

36.      Concussions typically occur when linear and rotational accelerations impact the brain through either direct impacts to the head or indirect impacts that whiplash the head. During the course of a college football season, studies have shown that athletes can receive more than 1,000 impacts greater than 10g (gravitational) force. This is slightly more force than a fighter pilot receives doing maximal maneuvers. The majority of football-related hits to the head exceed 20g's.

37.      Kevin Guskiewicz, of the University of North Carolina's Sports Concussion Research Program, compared the impacts sustained in a routine college football practice to crashing a car: "If you drove your car into a wall at twenty-five miles per hour and you weren't wearing your seat belt, the force of your head hitting the windshield would be around 100[g']s:

in effect, the player [who sustained two hits above 80g's,] had two car accidents that morning."[6]

        i.      <u>Concussion Symptoms</u>.

38.     When a student-athlete suffers a severe impact to the head, they may start experiencing concussion-related symptoms, including:

- "seeing stars" and feeling dazed, dizzy, or lightheaded;

- memory loss, such as trouble remembering things that happened right before and after the injury;

- nausea or vomiting;

- headaches;

- blurred vision and sensitivity to light;

- slurred speech or saying things that do not make sense;

- difficulty concentrating, thinking, or making decisions;

- difficulty with coordination or balance (such as being unable to catch a ball or other easy tasks);

- feeling anxious or irritable for no apparent reason; or

- feeling overly tired.

39.     A student-athlete may not recognize the signs or symptoms of a concussion, and, more often, the effect of the concussion itself prevents him from recognizing them. Because of that, he may put himself at risk of further injury by returning to a game after a concussion. Brains that have not had time to properly heal from a concussion are particularly susceptible to further injury.

        ii.     <u>Post-Concussion Treatment</u>.

---

[6]    Malcolm Gladwell, Offensive Play, *The New Yorker* (October 19, 2009) http://www.newyorker.com/magazine/2009/10/19/offensive-play.

40.     After a concussion, the brain needs time to heal. Doctors generally prohibit individuals from returning to normal activities—certainly including contact sports—until all symptoms have subsided. They do so because, immediately after a concussion, the brain is particularly vulnerable to further injury.

41.     The length of the healing process varies from person to person and from concussion to concussion. Symptoms may even last for one or two weeks.

42.     Individuals who do not recover from a concussion within a few weeks are diagnosed with post-concussion syndrome. The symptoms of post-concussion syndrome can last for months or sometimes even be permanent. Generally, people suffering from post-concussion syndrome are referred to specialists for additional medical help.

43.     Many people think of concussions as short-term, temporary injuries. But scientific research demonstrates that the effects of concussions are anything but temporary.

     B.     _Studies Confirm the Dangers and Long-Term Effects of Concussions_.

44.     The two leading studies of the long-term effects of concussions were conducted by Boston University's Center for the Study of Traumatic Encephalopathy and the Brain Injury Research Institute. These studies showed the "devastating consequences" of repeated concussions, including that they lead to an increased risk of depression, dementia, and suicide. These studies have also demonstrated that repeated concussions trigger progressive degeneration of the brain tissue, including the build-up of an abnormal protein called tau.

45.     Between 2002 and 2007, Dr. Omalu, of the Brain Injury Research Institute, examined the brains of five former NFL players: Andre Waters, Mike Webster, Terry Long, Justin Strzelcyyk, and Damien Nash. Waters killed himself, Nash died unexpectedly at the age of 24, Webster—homeless and cognitively impaired—died of heart failure, and Strzelcyyk died

driving the wrong way down a highway at 90 miles per hour. Four of the five brains showed the telltale characteristics of CTE, which is a progressive degenerative disease of the brain found in people with a history of repetitive brain trauma.

46.     Dr. Cantu, of the Boston University Center for the Study of Traumatic Encephalopathy, has found evidence of CTE in 90 of 94 (96%) autopsied brains of former NFL players. He has found CTE in 79% of all autopsied brains of former football players (who played at *any* level).

47.     Dr. Omalu now believes that more than 90% of former NFL players suffer from CTE.

48.     Unfortunately, studies like Drs. Cantu's and Omalu's—which establish the devastating dangers related to TBIs—date back to the early twentieth century. Beginning with studies on the brain injuries suffered by boxers in the 1920s, medical science has long recognized the debilitating effects of concussions and other TBI, and found that that repetitive head impacts can cause permanent brain damage and increased risk of long-term cognitive decline and disability.

49.     For instance, in 1928, pathologist Dr. Harrison Martland published a study called "Punch Drunk" in the *Journal of the American Medical Association*, where he described the clinical spectrum of abnormalities found in nearly 50 percent of boxers who had been knocked out or who had suffered a considerable impact to the head. *See* Dr. Harrison S. Martland, *Punch Drunk*, 91 JAMA 1103 (1928).

50.     Countless studies were later conducted on boxers suffering chronic neurological damage as a result of repeated head injuries and who were displaying signs of dementia and impairment of motor function. As incidents of chronic encephalopathy increased, they were often

characterized as a "Parkinsonian" pattern of progressive decline.

51.     Nearly a decade after Dr. Martland's study, the American Football Coaches Association first published a report warning that players who suffer concussions should be removed from play. Then nearly twenty years after that, in 1952, an article published in *The New England Journal of Medicine* first recommended a three-strike rule for concussions in football, that recommended that players cease to play football permanently after receiving their third concussion.

52.     Starting in the late 1960's, the medical community began focusing on the effects of concussion-related injuries in football. In a 1967 study, Drs. Hughes and Hendrix examined how severe impacts affected brain activity in football players by utilizing electroencephalograms (commonly known as "EEGs"). Shortly after that, a potentially fatal condition known as "Second Impact Syndrome" was identified, which is a re-injury to an already-concussed brain that triggers swelling that the skull cannot accommodate.

53.     Study after study published in medical journals including the *Journal of the American Medical Association*, *Neurology*, *The New England Journal of Medicine*, and *Lancet* warned of the dangers of single concussions, multiple concussions, and/or football-related head trauma from multiple concussions. These studies collectively established that:

- repetitive head trauma in contact sports, including football, has potential dangerous long-term effects on brain function;

- encephalopathy (dementia pugilistica) is caused by repeated sub-concussive and concussive blows to the head;

- acceleration and rapid deceleration of the head that results in brief loss of consciousness also results in a tearing of the axons (brain cells) brainstem;

- with respect to head injury in athletes who play contact sports, there is a relationship between neurologic pathology

and length of the athlete's career;

- immediate retrograde memory issues occur following concussions;

- head injury requires recovery time without risk of subjection to further injury;

- a football player who suffers a concussion requires significant rest before being subjected to further contact; and,

- minor head trauma can lead to neuropathological and neurophysiological alterations, including neuronal damage, reduced cerebral blood flow, altered brainstem evoked potentials and reduced speed of information processing.

54. As a result of these, and countless other studies, medical professionals began recommending changes to the game of football and how concussion-related injuries should be handled.

55. By 1991, Dr. Cantu, the American Academy of Neurology, and Colorado Medical Society developed return-to-play criteria for football players suspected of sustained head injuries.

56. In 2003, a NCAA concussion study concluded that football players who had previously sustained a concussion were more likely to have future concussion injuries. Another 2003 NCAA concussion study concluded that collegiate football players "may require several days for recovery of symptoms, cognitive dysfunction, and postural instability after [a] concussion," and that concussions are "followed by a complex cascade of ionic, metabolic, and physiological events that can adversely affect cerebral function for several days to weeks."[7]

57. Following these studies, a National Athletic Trainers' Association position

---

[7]    Michael McCrea, *et al.*, Acute Effects and Recovery Time Following Concussion in Collegiate Football Players, The NCAA Concussion Study, *The Journal of the American Medical Association* (November 19, 2003), *available at* http://jama.jamanetwork.com/article.aspx?articleid=197668.

statement in 2004 recommended baseline cognitive and postural-stability testing, as well as

return-to-play recommendations including holding out athletes who exhibit symptoms of a

suspected head injury.

58.     Building upon that, a convention of neurological experts met in Prague in 2004

with the aim of providing recommendations for the improvement of safety and health of athletes

who suffer concussive injuries in ice hockey, rugby, football, and other sports based on the most

up-to-date research. These experts recommended that a player never be returned to

play   symptomatic, and coined the phrase, "when in doubt, sit them out."

59.     Ultimately, while Defendants knew of the harmful effects of TBI on student-

athletes for decades, they ignored these facts and failed to institute any meaningful methods of

warning and/or protecting student-athletes, including football players. For Defendants, the

continued expansion and operation of college football was simply too profitable to put at risk.

**III.    Defendants Breached Their Duties to Their Student-Athletes By Ignoring the
          Dangers of Concussions and Failing to Implement Reasonable Concussion
          Management Protocols.**

60.     For decades, Defendants have been aware that severe head impacts can lead to

long-term brain injury, including memory loss, dementia, depression, and CTE. While

Defendants knew about the harmful and devastating effects of these sub-concussive and

concussive injuries, they recklessly ignored these facts and failed to implement reasonable

concussion management protocols to protect their student-athletes.

61.     In fact, on information and belief, during every decade referenced above,

Defendants were advised by physicians and researchers of the severe risks associated with

playing football, including the risks associated with TBI.

62.     Since at least 1933, the NCAA has known of the serious nature of concussions

and recognized the need for appropriate concussion management protocols. In its 1933 Medical Handbook, the NCAA specifically recognized that head injuries warrant special attention and should not be regarded lightly. The Handbook then provided information for school and college doctors, coaches, and trainers to identify the signs and symptoms of concussions, as well as methods to be used on the sidelines for treating them.

63.     Rather than inform their student-athletes of these risks or implement protocols to protect and safeguard them from TBI-related injuries (as, at least, the NCAA and Big Sky promised to do through the NCAA Constitution, among other things), Defendants failed to meaningfully adopt the internationally accepted guidelines regarding concussion management and return to play protocols until 2010.

64.     Instead, and in complete disregard of the vast body of known scientific evidence and the resources and authority possessed by Defendants, up until 2010, Defendants failed to:

- implement guidelines or rules to prevent repeated concussions and failed to educate players about the increased risk of concussive and sub-concussive injury in football, particularly under circumstances when the helmet is used as a weapon when tackling, blocking, or running with the football;

- recommend or enforce return to play procedures or take any action to educate student-athletes about the risks of repetitive head injuries;

- conduct a football program that proactively encouraged Plaintiff and other Weber State football players to avoid head injuries, instead compelling players to ignore concussion symptoms and continue to play football within moments of experiencing concussion symptoms. For instance, Weber State coaches demanded that Weber State football players, including Plaintiff, forego their own self-interest and continue playing despite sustaining head injuries for the purpose of advancing the Weber State football program by winning games, obtaining fame and favorable publicity, and gaining millions of dollars in revenue for Weber State, Big Sky, and the NCAA; and

- contact Plaintiff and other Weber State football players after they left Weber State to inform them that had been exposed to an increased risk of long-term brain damage by the concussive and sub-concussive blows sustained while playing football for Weber State.

65.     It was also not until April 2010, under mounting public pressure, that the NCAA made changes to its concussion treatment protocols, this time passing legislation that required its member institutions to have a Concussion Management Plan ("CMP") in place for all sports.

66.     Under that new policy, schools were required to have a CMP on file "such that a student-athlete who exhibits signs, symptoms, or behaviors consistent with a concussion shall be removed from practice or competition and evaluated by an athletics healthcare provider with experience in the evaluation and management of concussions."

67.     The policy further states that students diagnosed with a concussion "shall not return to activity for the remainder of that day" and the team physician would determine that medical clearance.

68.     Finally, the policy required students to sign a statement "in which they accept the responsibility for reporting their injuries and illnesses, including signs and symptoms of concussion" to medical staff and noted that students would be provided educational materials on concussions during the signing process.

69.     However, this policy is also flawed: due to the very nature of concussions, student-athletes suffering concussive injuries are in no position to police themselves or to give informed consent about whether to continue playing. As Defendants have long known, the types of questions used to screen players for concussions include "What's your name?", "What year is it?", and "What sport are we playing?". These types of questions are used for screening precisely because players experiencing concussions routinely fail to answer them correctly. A player who cannot state his or her own name is in no condition to make an informed decision about whether or not to continue playing, and is entirely dependent on others, such as NCAA, Big Sky, and Weber State, to identify concussive injuries in real-time and take appropriate remedial actions

For an injured student, Defendants stand in the role of a guardian tasked with making decisions in the student's best interest. For decades, Defendants have failed to fulfill that role and have instead acted in their own best interest, all to the life long detriment of thousands of 18 to 22 year olds.

70.     In the end, these (still deficient) policies were implemented far too late for Plaintiff and the Class, who suffered reasonably foreseeable harm as a result of Defendants' misconduct.

## FACTS SPECIFIC TO PLAINTIFF ERIC WESTON

71.     Plaintiff Eric Weston played football at Weber State from 1996–1997 as a defensive end.

72.     Weston suffered many concussive and sub-concussive hits while playing football for Weber State. In fact, the hits he sustained were so severe that Weston often could not remember the games or the injuries he suffered after.

73.     Since the inception of Weber State's football program, through at least 2010, there were no adequate concussion management protocols or policies in place to address and treat concussions sustained by student-athletes during practice and in games.

74.     In fact, although Weston sustained repetitive concussive and sub-concussive hits in practices and games for their profit and promotion, the NCAA, Weber State, and Big Sky failed to adopt or implement adequate concussion management safety protocols or return to play guidelines during his time on Weber State's football team.

75.     As one of the team's leading defensive players, Weston was often encouraged to hit harder and faster despite the serious blows that he was receiving. Accordingly, when he would suffer from a concussive or sub-concussive hit, Weston would often be returned to the

field of play quickly.

76.     Likewise, when Weston suffered from many concussive or sub-concussive hits, he was often deprived by the Defendants of the appropriate medical attention and treatment that they knew was necessary to monitor, manage, and mitigate risks associated with TBI.

77.     As a result, Weston now suffers from severe anxiety, depression, fatigue, headaches, neurological disorders, memory loss, mood swings, and other debilitating issues. Weston's medical team has diagnosed him with major depressive disorder, major neurocognitive disorder, and CTE.

## CLASS ACTION ALLEGATIONS

78.     **Class Definitions**: Plaintiff Eric Weston brings this action pursuant to Federal Rule of Civil Procedure Rule 23(b)(3) on behalf of himself and a class and subclass, defined as follows:

> **Class**: All individuals who participated in Weber State's varsity football program between 1952 and 2010.

> **Big Sky Subclass**: All individuals who participated in Weber State's varsity football program between 1963 and 2010.

The following people are excluded from the Class: (1) any Judge or Magistrate presiding over this action and members of their families; (2) Defendants, Defendants' subsidiaries, parents, successors, predecessors, and any entity in which the Defendants or their parents have a controlling interest and its current or former employees, officers and directors; (3) persons who properly execute and file a timely request for exclusion from the Class; (4) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (5) Plaintiff's counsel and Defendants' counsel; and (6) the legal representatives, successors, and assigns of any such excluded persons.

19

79. **Numerosity**: The exact number of the members of the Class is unknown and not available to Plaintiff at this time, but it is clear that individual joinder is impracticable. On information and belief, hundreds of Weber State football players fall into the definition of the Class. Members of the Class can be identified through Defendants' records.

80. **Commonality**: There are many questions of law and fact common to the claims of Plaintiff and the Class, and those questions predominate over any questions that may affect individual members. Common questions for the Class include, but are not limited to the following:

(a) Whether Defendants had a duty to adequately warn and educate players about the dangers and symptoms of concussions and concussion-related brain injuries;

(b) Whether Defendants had a duty to enact rules and procedures to protect players from sustaining concussions and concussion-related traumatic brain injuries;

(c) Whether Defendants' conduct as alleged herein constitutes a breach of duty;

(d) Whether Defendants' conduct as alleged herein constitutes negligence;

(e) Whether Defendants' conduct as alleged herein constitutes breach of contract;

(f) Whether Defendants were unjustly enriched at the expense of Plaintiff and the Class; and

(g) Whether Plaintiff and the Class are entitled to relief, including actual and compensatory damages, and injunctive or other equitable relief.

81. **Typicality**: Plaintiff's claims are typical of the claims of other members of the Class, as Plaintiff and other members sustained injuries arising out of the wrongful conduct of Defendants based upon the same unlawful conduct.

82. **Adequate Representation**: Plaintiff will fairly and adequately protect the interests of the Class and has retained counsel competent and experienced in complex litigation and class actions. Plaintiff has no interests antagonistic to those of the Class, and Defendants have no defenses unique to Plaintiff.

83. **Predominance and Superiority**: Class proceedings are superior to all other available methods for the fair and efficient adjudication of this controversy, as joinder of all members is impracticable. Individual litigation would not be preferable to a class action because individual litigation would increase the delay and expense to all parties due to the complex legal and factual controversies presented in this Complaint. By contrast, a class action presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court. Economies of time, effort, and expense will be fostered and uniformity of decisions will be ensured.

### FIRST CAUSE OF ACTION
### NEGLIGENCE
### (Individually and on Behalf of the Class as Against Defendants)

84. Plaintiff incorporates by reference the foregoing allegations.

85. From its inception and by virtue of its role as the governing body in college athletics, the NCAA has historically assumed a duty to protect the health and safety of all student-athletes at member institutions. The NCAA also assumed a duty of care by voluntarily taking steps to protect and promote the health and safety of its players, including promulgating safety handbooks and regulations. That duty included an obligation to supervise, regulate, and monitor the rules of its governed sports, and provide appropriate and up-to-date guidance and regulations to minimize the risk of injury to football players. Defendant Big Sky shared this same duty to supervise, regulate, and monitor the rules of their governed sports, and provide

21

appropriate and up-to-date guidance and regulations to minimize the risk of injury to football players.

86.     The duties of all Defendants included an obligation to supervise, regulate, and monitor the rules of the Weber State football program and provide appropriate and up-to-date guidance and regulations to minimize the risk of long-term and short-term brain damage to Weber State football players.

87.     Defendants NCAA and Big Sky had a duty to educate Weber State and Weber State football players on the proper ways to evaluate and treat TBI during football games and practices, including repetitive sub-concussive and concussive injury. Defendants' duties further included a duty to warn student athletes of the dangers of sub-concussive and concussive injuries and of the risks associated with football before, during, and after they played college football and as additional information came to light.

88.     All Defendants had a duty not to conceal material information from Weber State football players, including Plaintiff.

89.     Defendants breached their duties to Plaintiff and the Class by failing to implement, promulgate, or require appropriate and up-to-date guidelines regarding the evaluation and treatment of TBIs on the playing field, in locker rooms, and in the weeks and months after Weber State football players sustained TBIs, as well as providing treatment for the latent effects of TBI. These failings include, but are not limited to:

> (a)     failing to recognize and monitor concussive and sub-concussive injury during football practices and games;
>
> (b)     failing to inform the student football players of the dangers of concussive and sub-concussive injuries;
>
> (c)     failing to implement return to play regulations for student football players who sustained concussive and/or sub-

concussive injuries and/or is suspected of sustaining such injuries;

(d)     failing to implement procedures to monitor the health of football players who have sustained (or are suspected of sustaining) concussive and/or sub-concussive injuries;

(e)     failing to inform the football players' extended families of concussive and/or sub-concussive injuries the student football players had sustained; and

(f)     failing to provide adequate notification, warning and treatment for latent neuro-cognitive and neuro-behavioral effects of concussive and sub-concussive injuries, after the time Plaintiff left Weber State.

90.     Defendants breached their duties to Plaintiff and the Class by failing to disclose and/or failing to recognize and/or being willfully blind to: (a) material information regarding the long-term risks and effects of repetitive head trauma they possessed or should have possessed; (b) the dangers of concussive and sub-concussive injuries; and (c) the proper ways to evaluate, treat, and avoid concussive and sub-concussive trauma to student football players.

91.     Plaintiff and the Class relied upon the guidance, expertise, and instruction of Defendants in understanding risks associated with the serious and life-altering medical issue of concussive and sub-concussive risk in football.

92.     At all times, Defendants had superior knowledge of material information regarding the effect of repeated traumatic head injuries. Because such information was not readily available to Plaintiff and the Class, Defendants knew or should have known that Plaintiff and the Class would act and rely upon the guidance, expertise, and instruction of Defendants on this crucial medical issue, while at Weber State and thereafter.

93.     Repetitive TBIs during college football practices and games have a pathological and latent effect on the brain. Repetitive exposure to rapid accelerations to the head causes

23

deformation, twisting, shearing, and stretching of neuronal cells such that multiple forms of damage take place, including the release of small amounts of chemicals within the brain, such as protein, which is a signature pathology of the same phenomenon as boxer's encephalopathy (or "punch drunk syndrome") studied and reported by Harrison Martland in 1928.

94.     Plaintiff and Class experienced repetitive sub-concussive and concussive brain impacts during his college football career that significantly increased his risk of developing neurodegenerative disorders and diseases, including but not limited to CTE, Alzheimer's disease, and other similar cognitive-impairing conditions.

95.     The repetitive head accelerations and hits to which Plaintiff and the Class were exposed presented risks of latent and long-term debilitating chronic illnesses. Absent Defendants' negligence and concealment, the risk of harm to Plaintiff and the Class would have been materially lower, and Plaintiff and other members of the Class would not have sustained the brain damage from which they currently suffer.

96.     The repetitive head impacts and TBIs Plaintiff and the Class sustained while playing football at Weber State resulted in neuro-cognitive and neuro-behavioral changes, including neuro-cognitive disability, decline, and forgetfulness, all of which will require future medical care.

97.     As a direct and proximate result of Defendants' negligence, Plaintiff and the Class have incurred damages in the form of permanent brain damage, emotional distress, past and future medical costs, health care, home care expenses, other out of pocket expenses, lost time, lost future earnings, and other damages. Plaintiff and other members of the Class will likely incur future damages caused by Defendants' negligence.

98.     As a result of their misconduct, Defendants are liable to Plaintiff and the Class for

the full measure of damages allowed under applicable law. Plaintiff, individually and on behalf of the Class, seeks actual damages for Defendants' negligence, as well as interest, reasonable attorneys' fees, expenses, and costs to the extent allowable.

**SECOND CAUSE OF ACTION**
**BREACH OF EXPRESS CONTRACT**
**(<u>Individually and on Behalf of the Class as Against Defendant NCAA</u>)**

99.     Plaintiff incorporates by reference the foregoing allegations.

100.    As a football player at Weber State, an institution governed by the NCAA, Plaintiff and other members of the Class were required to, and did, enter into a contract with the NCAA as a prerequisite to sports participation. The contract required Plaintiff and other members of the Class to complete a form affirming that they had read the NCAA regulations and applicable NCAA Division manual, which expressly encompassed the NCAA Constitution, Operating Bylaws, and Administrative Bylaws, and further, that they agreed to abide by NCAA Division bylaws.

101.    In exchange for Plaintiff's and the Class's agreement, the NCAA promised to perform certain services and functions, including, among other things:

> (a)    conducting intercollegiate athletics in a manner designed to protect and enhance the physical and educational wellbeing of student-athletes;
>
> (b)    requiring that each member institution protect the health of, and provide a safe environment for, each of its participating student-athletes; and
>
> (c)    requiring that each member institution must establish and maintain an environment in which a student-athlete's activities are conducted as an integral part of the student-athlete's educational experience.

102.    By signing or otherwise agreeing to abide by NCAA regulations, and thereafter participating in NCAA sanctioned sports programs in accordance with such regulations, Plaintiff

25

and the Class fulfilled their contractual obligations to the NCAA.

103.    As described in the foregoing allegations, the NCAA breached the Parties'

agreements by failing to ensure that their student-athletes were provided with a safe environment

in which to participate in NCAA sport activities. The NCAA further breached the contract by

failing to properly educate and warn players about the symptoms and long-term risks of

concussions and concussion-related traumatic injury.

104.    Plaintiff and the Class entered into a written agreement with NCAA in which they

committed to play football at Weber State, to attend Weber State as students, and to comply with

all codes of conduct and obligations as both football players and students at Weber State.

105.    Plaintiff and the Class fulfilled their obligations under the contract by playing

football at Weber State.

106.    The NCAA's contractual breaches caused Plaintiff and the Class to suffer

physical injury and damages in the form of past, ongoing, and future medical expenses.

107.    As a result of its misconduct, Defendant NCAA is liable to Plaintiff and the Class

for the full measure of damages allowed under applicable law. Plaintiff, individually and on

behalf of the Class, seeks actual damages for NCAA's contractual breaches, as well as interest,

reasonable attorneys' fees, expenses, and costs to the extent allowable.

## THIRD CAUSE OF ACTION
## BREACH OF IMPLIED CONTRACT
## (Individually and on Behalf of the Class as Against Defendants)

108.    Plaintiff incorporates by reference the foregoing allegations.

109.    To the extent that an express written contract cannot be established

among   Plaintiff, the Class, and Defendants, the facts set forth above support finding the

existence of an implied contract between the Parties.

110. Under the implied contract, student-athletes agreed to be bound by NCAA and Big Sky rules and regulations in exchange for their participation in NCAA and Big Sky controlled athletic programs, including the Weber State football program. As a condition of the implied contract, the NCAA agreed to abide by, and Weber State agreed to implement, the promises set forth in its own Constitution and Bylaws, as described above.

111. Plaintiff and the Class indicated their acceptance of the contract, and further, fully performed under the contract, by participating in the Weber State football program in accordance with NCAA and Weber State rules and regulations.

112. Defendants breached their implied contractual duties by failing to ensure that student-athletes were provided with a safe environment in which to participate in football activities. Defendants further breached their implied contractual duties by concealing and/or failing to properly educate and warn players about the symptoms and long-term risks of concussions and concussion-related traumatic injury.

113. Defendants' breaches caused Plaintiff and the Class to suffer physical injury and damages in the form of past, ongoing, and future medical expenses, other out of pocket expenses, lost time, lost future earnings, and other damages. Further, Plaintiff and the Class will likely incur future damages caused by Defendants' breaches.

114. As a result of their misconduct, Defendants are liable to Plaintiff for the full measure of damages allowed under applicable law. Plaintiff, individually and on behalf of the Class, seeks actual damages for Defendants' contractual breaches, as well as interest, reasonable attorneys' fees, expenses, and costs to the extent allowable.

**FOURTH CAUSE OF ACTION**
**BREACH OF EXPRESS CONTRACT**
**(Individually and on Behalf of the Class as Third-Party**
**<u>Beneficiaries as Against Defendant NCAA</u>)**

115.     Plaintiff incorporates by reference the foregoing allegations.

116.     To the extent that no express or implied contract is found to exist between Plaintiff and Defendants, an express contract existed between the NCAA and Weber State.

117.     Under the terms of that contract, Weber State agreed to abide by the applicable NCAA rules and regulations, including those expressly set forth in the NCAA's Division Manuals, Constitution, and Bylaws.

118.     Under the terms of that contract, as set forth in the NCAA Constitution and encompassed within the NCAA Division Manuals, Weber State and NCAA agreed to, among other things: (1) conduct intercollegiate athletic programs in a manner designed to protect and enhance the physical and educational well-being of student athletes; and (2) protect the health of and provide a safe environment for each of its participating student-athletes.

119.     Plaintiff and the Class are the intended third-party beneficiaries of the contract between the NCAA and Weber State. Such an intention can be found in the express language of the NCAA's rules and regulations, as well as the stated purpose and principles of the NCAA organization.

120.     NCAA breached the contractual duties owed to Plaintiff and the Class under that contract by: (1) failing to implement or require rules of play and return to play criteria to minimize or prevent the risk of concussions and concussion-related injuries; and (2) failing to adequately inform and educate Weber State football players on the symptoms and long-term dangers of concussions and concussion-related injuries.

121.     As a direct result of NCAA's breach, Plaintiff and the Class suffered physical injury and damages in the form of past, ongoing, and future medical expenses, and other out of pocket expenses, lost time, lost future earnings, and other damages. Further, Plaintiff and the

Class will likely incur future damages caused by NCAA's conduct.

122.    As a result of its misconduct, Defendant NCAA is liable to Plaintiff and the Class for the full measure of damages allowed under applicable law. Plaintiff, individually and on behalf of the Class, seeks actual damages for the NCAA's contractual breaches, as well as interest, reasonable attorneys' fees, expenses, and costs to the extent allowable.

## FIFTH CAUSE OF ACTION
## UNJUST ENRICHMENT
### (*In the Alternative to Breach of Contract*)
### (Individually and on Behalf of the Class as Against Defendants)

123.    Plaintiff incorporates by reference the foregoing allegations, excluding paragraphs 99–122.

124.    Defendants receive significant revenues from the collegiate football played by student-athletes. These revenues include, but are not limited to, contractual revenues from broadcasting, merchandising agreements, and ticket sales.

125.    Defendants appreciate and have knowledge of such benefits, and retain them to this day.

126.    Under principles of equity and good conscience, Defendants should not be permitted to retain the profits they received and retained at the expense of Plaintiff and the Class while refusing to provide compensation for the injuries suffered by Plaintiff and the Class as a result of their unlawful conduct, including their failure to guard against, educate as to, or otherwise failing to prevent such injuries.

127.    Plaintiff, individually and on behalf of the Class, seeks restitution and/or disgorgement of all monies Defendants have unjustly received and retained as a result of their unlawful conduct alleged herein.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Eric Weston, individually and on behalf of the Class, requests that the Court enter an Order providing for the following relief:

A.      Certify this case as a class action on behalf of the Class defined above, appoint Plaintiff as Class Representative, and appoint his counsel as Class Counsel;

B.      Declare that Defendants' actions, as set out above, constitute negligence, breach of contract, and/or unjust enrichment;

C.      Award all economic, monetary, actual, consequential, compensatory, and punitive damages caused by Defendants' conduct, including without limitation damages for past, present, and future medical expenses, other out of pocket expenses, lost time and interest, lost future earnings, and all other damages suffered, including any future damages likely to be incurred by Plaintiff and the Class;

D.      Award Plaintiff and the Class their reasonable litigation expenses and attorneys' fees;

E.      Award Plaintiff and the Class pre- and post-judgment interest, to the extent allowable;

F.      Enter injunctive and/or declaratory relief as is necessary to protect the interests of Plaintiff and the Class; and

G.      Award such other and further relief as equity and justice may require.

## JURY DEMAND

Plaintiff demands a trial by jury for all issues so triable.

Respectfully submitted,

**ERIC WESTON**, individually and on behalf of all others similarly situated,

Dated: June 8, 17                By: /s/ Jeff Raizner _____

One of Plaintiff's Attorneys

Jeff Raizner
efile@raiznerlaw.com
RAIZNER SLANIA LLP
2402 Dunlavy Street
Houston, Texas 77006
Tel: 713.554.9099
Fax: 713.554.9098

Jay Edelson*
jedelson@edelson.com
Benjamin H. Richman*
brichman@edelson.com
EDELSON PC
350 North LaSalle Street, 13th Floor
Chicago, Illinois 60654
Tel: 312.589.6370
Fax: 312.589.6378

Rafey S. Balabanian*
rbalabanian@edelson.com
EDELSON PC
123 Townsend Street
San Francisco, California 94107
Tel: 415.212.9300
Fax: 415.373.9435

Sol Weiss*
sweiss@anapolweiss.com
Larry Coben*
lcoben@anapolweiss.com
David Senoff*
dsenoff@anapolweiss.com
ANAPOL WEISS
One Logan Square
130 North 18th Street, Suite 1600
Philadelphia, Pennsylvania 19103
Tel: 215.735.2098
Fax: 215.875.7701

*Counsel for Plaintiff and the Putative Class*

*\*Pro hac vice* admission to be sought.