**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **ERIC WESTON, individually and on behalf of all others similarly situated,** | ) ) ) | **MDL No. 2492** |
| | ) | **Master Docket No. 16 C 8787** |
| **Plaintiff,** | ) ) | |
| **v.** | ) ) | **Original N.D. Ill. Docket No. 17 C 4975** |
| | ) | |
| **BIG SKY CONFERENCE, a Utah non-profit Corporation, and NATIONAL COLLEGIATE ATHLETIC ASSOCIATION,** | ) ) ) | **Judge John Z. Lee** |
| **Defendants.** | ) ) | |

<u>**MEMORANDUM OPINION AND ORDER**</u>

Eric Weston has filed this action individually and on behalf of a putative class of similarly situated student-athletes who played football for WSU University ("WSU") in Utah. He has sued the National Collegiate Athletic Association ("NCAA") and the Big Sky Conference ("Big Sky")—the athletic conference in which WSU plays—based upon theories of negligence, breach of express and implied contract, breach of express contract as a third-party beneficiary, and unjust enrichment, all arising out of Defendants' alleged failure to adopt and implement adequate concussion treatment, concussion management safety protocols, and return-to-play guidelines.

Big Sky has moved to dismiss the complaint for lack of personal jurisdiction under Federal Rules of Civil Procedure 12(b)(2). The NCAA has moved to partially dismiss the complaint pursuant to 12(b)(6). For the reasons provided below, Big Sky's Rule 12(b)(2) motion is granted, and the NCAA's Rule 12(b)(6) motion is denied.

# I.     Factual Background[1]

## A.     Weston at WSU

The WSU football program draws thousands of fans to games.  Compl. ¶ 18, ECF No. 1.
Given the team's consistent success and loyal following, the program generates millions of dollars
of revenue every year.  *Id.*  The strength of WSU's football program has attracted top talent from
around the country, and Weston was no exception.  *Id.*

Weston played defensive end for WSU in Utah from 1996 to 1997, and, in that role, he
sustained repetitive concussive and subconcussive hits during practices and games.  *Id.* ¶¶ 71–74.
The hits often were so severe that Weston would not be able to remember the games he played in
or the injuries he suffered.  *Id.* ¶ 72.

Weston alleges that, during this time, the NCAA and Big Sky failed to put in place adequate
concussion treatment standards, concussion management safety protocols, and return-to-play
guidelines.  *Id.* ¶ 73.  As a result, Weston would be put back quickly into games and practices
despite his injuries.  *Id.* ¶ 75.  Moreover, he asserts that Big Sky and the NCAA knew at the time
that such treatment, protocols, and guidelines were necessary to monitor, manage, and mitigate the
risks associated with traumatic brain injury.  *Id.* ¶ 76.  As a result, Weston now suffers from severe
anxiety, depression, fatigue, headaches, neurological disorders, memory loss, mood swings, and
other debilitating health issues.  *Id.* ¶ 77.

## B.     Defendants' Roles in Safeguarding Weston's Health

The NCAA is the governing body of collegiate athletics that oversees twenty-three college
sports and over 400,000 students who participate in intercollegiate athletics, including WSU

---

[1]     On a motion to dismiss, the district court accepts all well-pleaded facts as true and draws
all  reasonable inferences in the plaintiff's favor.  *Kanter v. Barr*, 919 F.3d 437, 441 (7th Cir. 2019).

football players.[2]  *Id.* ¶ 15.  To accommodate the wide spectrum of student-athletes at its member schools, the NCAA has three different divisions of intercollegiate competition.  *Id.* ¶ 16.  Each NCAA division is composed of several conferences, such as Big Sky, to facilitate regional league play.  *Id.* ¶ 17.

Over the years, Big Sky has comprised member institutions located in Arizona, California, Colorado, Connecticut, Idaho, Montana, Nevada, New York, Utah, and Washington.  *Id.* ¶ 17; *see also* Big Sky Ex., Nadolski Decl. ¶¶ 10–11 (listing members).  According to Weston, Big Sky conducts business throughout the United States, including Indiana.  *Id.* ¶ 10.  Together, the NCAA and Big Sky regulate the WSU football program and owe a duty of care to safeguard the well-being of its student-athletes.  *Id.* ¶¶ 19, 85.

The NCAA and Big Sky are governed by the NCAA Constitution, which states that their primary obligation is to ensure that "[i]ntercollegiate athletics programs shall be conducted in a manner designed to protect and enhance the physical and educational well-being of student athletes."  *Id.* ¶ 24.  To accomplish this purpose, the NCAA has promulgated and implemented certain regulations and requirements for its sports, such as Operating Bylaws and Administrative Bylaws, which provide detailed instructions on game and practice rules for player well-being and safety.  *Id.* ¶ 25.

The NCAA also publishes a Sports Medicine Handbook ("Handbook"), which it updates every year.  *Id.* ¶ 26.  The Handbook includes official policies for the treatment and prevention of

---

[2]     The NCAA's predecessor, the Intercollegiate Athletic Association of the United States, was specifically formed at the turn of the twentieth century in order to make college football safer for student-athletes, who were experiencing head injuries at an alarming rate.  *Id.* ¶ 20.  In the same vein, the singular goal of the NCAA was and is student-athlete safety.  *Id.*

sport-related injuries, as well as return-to-play guidelines. *Id.* These policies recognize that "student-athletes rightfully assume that those who sponsor intercollegiate athletics have taken reasonable precautions to minimize the risk of injury from athletics participation." *Id.* As an NCAA member conference, Big Sky is required to enforce all applicable NCAA policies to protect the health and safety of WSU football players, such as Weston. *Id.* ¶¶ 30–31. In addition, member institutions such as WSU also are required to comply with all applicable NCAA rules and regulations. *Id.* ¶ 31. Moreover, the NCAA Constitution states that the NCAA "shall assist [each] institution in its efforts to achieve full compliance with all rules and regulations." *Id.* ¶ 27.

As compared to Weston and other WSU football players, the NCAA and Big Sky were in a superior position to detect and mitigate the risks of concussions. *Id.* ¶ 32. And WSU football players relied on the NCAA and Big Sky to protect their health and safety by preventing and treating head-related injuries. *Id.* ¶ 91.

## C.     Concussions and Concussion-related Symptoms

A concussion is a traumatic brain injury that occurs when an impact causes the head and brain to move rapidly back and forth. *Id.* ¶ 34. During everyday activity, spinal fluid protects the brain from touching the skull. *Id.* ¶ 35. But even relatively minor impacts, including direct impacts to the head and impacts to the body that cause the neck to whiplash, can cause the brain to press through the fluid and touch the skull. *Id.*

Studies have shown that collegiate football players, during the course of a season, can receive more than 1,000 impacts greater than 10G's.[3] *Id.* ¶ 36. And the majority of football-related hits to the head exceed 20G's. *Id.*

---

[3]     "G" is an abbreviation for "G-force," the force of gravity or acceleration on a body. *See* https://www.merriam-webster.com/dictionary/g-force.

When a football player suffers a severe impact to the head, he or she may experience a variety of symptoms, including: (1) seeing stars, dizziness or lightheadedness; (2) memory loss; (3) nausea; (4) vomiting; (5) headaches; (6) blurred vision or light sensitivity; (7) slurred speech; (8) difficulty concentrating or decision-making; (9) difficulty with coordination or balance; (10) unexplained anxiety or irritability; and/or (11) excessive fatigue. *Id.* ¶ 38. These symptoms may prevent a concussed person from even recognizing that they have suffered a concussion. *Id.* ¶ 39.

After a concussion, the brain needs time to heal to prevent further injury. *Id.* ¶ 40. Concussion symptoms may continue for two weeks. *Id.* ¶ 41. Doctors generally prohibit concussed patients from returning to normal activities until all symptoms have subsided. *Id.* ¶ 40. Individuals who continue to experience concussion symptoms after a few weeks are diagnosed with post-concussion syndrome. *Id.* ¶ 42. Many people think of concussions as short-term injuries, but scientific research has shown that concussions can have long-lasting effects. *Id.* ¶ 43.

## D. Long-term Effects of Concussions and Subconcussive Impacts

The complaint cites numerous studies that discuss the risks associated with brain trauma. *Id.* ¶¶ 44–59. For example, studies of brain injuries suffered by boxers date back to the 1920s. *Id.* ¶ 49. In a study published in 1928, Dr. Harrison Martland described the abnormalities found in nearly half of the boxers who had either been knocked out or who had suffered a considerable impact to the head. *Id.* Other studies of boxers revealed that repetitive head injuries caused chronic neurological damage and a pattern of progressive decline in the form of dementia and motor function impairment. *Id.* ¶ 50.

The American Football Coaches Association published a report in the 1930s warning that players who suffered concussions should be removed from play. *Id.* ¶ 51. A 1952 article published in *The New England Journal of Medicine* recommended a three-strike rule that would prohibit

players from playing football after three concussions. *Id.* In a 1967 study, Drs. J.R. Hughes and D.E. Hendrix used electroencephalograms ("EEGs") to examine the impact of severe hits on brain activity. *Id.* ¶ 52. Shortly thereafter, doctors identified a potentially fatal condition known as "Second Impact Syndrome," referring to a skull of an already-concussed brain that cannot accommodate another impact injury. *Id.*

More recently, Boston University's Center for the Study of Traumatic Encephalopathy and the Brain Injury Research Institute conducted two well-regarded studies describing the long-term effects caused by concussions. *Id.* ¶ 44. These studies demonstrated that repeated concussions triggered progressive degeneration of brain tissue, including the build-up of an abnormal protein called "tau." *Id.* The studies also showed that repeated concussions resulted in an increased risk of depression, dementia, and suicide. *Id.*

In yet another example, Dr. Robert Cantu studied autopsies performed on the brains of former National Football League players, concluding that 90 of 94 (96%) of the samples showed signs of chronic traumatic encephalopathy ("CTE"). *Id.* ¶ 46. Dr. Cantu also reviewed analyses of brains of individuals who played football at any level and found that 79% exhibited indications of CTE. *Id.*

According to Weston, study after study published in established medical journals, including the *Journal of the American Medical Association*, *Neurology*, *The New England Journal of Medicine*, and *Lancet*, warned of the dangers arising from single and multiple concussions. *Id.* ¶ 53. These studies established that:

- even minor head trauma can lead to neuropathological and neurophysiological alterations, including neuronal damage, reduced cerebral blood flow, altered brainstem evoked potentials, and reduced speed of information processing;

- acceleration and rapid deceleration of the head that results in brief loss of consciousness also results in a tearing of the brain tissue;

- immediate retrograde memory issues occur following concussions;

- repetitive head trauma has potential dangerous long-term effects on brain function, including causing encephalopathy;

- a football player who suffers a concussion requires significant rest before being subjected to further contact to avoid risk of further injury; and

- there is a relationship between neurologic pathology and length of the athlete's career in contact sports.

*Id.*

As a result of these studies, medical professionals began recommending changes to football and how concussion-related injuries should be handled. *Id.* ¶ 54. By 1991, Dr. Cantu, the American Academy of Neurology, and the Colorado Medical Society had developed return-to-play criteria for football players suspected of sustained traumatic brain injuries. *Id.* ¶ 55.

For its part, the NCAA began conducting its own concussion-related studies in 2003. *Id.* ¶ 56. One of these studies concluded that football players, who had previously sustained a concussion, were more likely to have future concussion-related injuries. *Id.* Another NCAA study found that collegiate football players "may require several days for recovery of symptoms, cognitive dysfunction, and postural instability after [a] concussion," and that concussions are "followed by a complex cascade of ionic, metabolic, and physiological events that can adversely affect cerebral function for several days to weeks." *Id.*

Along these same lines, in 2004, the National Athletic Trainers' Association issued a position statement recommending baseline cognitive and postural-stability testing, as well as return-to-play guidelines prohibiting athletes who exhibit symptoms of a suspected head injury from playing. *Id.* ¶ 57. That same year, neurological experts convened in Prague to improve the safety and health of athletes, who suffer concussive injuries in football and other contact sports, based on the latest research. *Id.* ¶ 58. These experts recommended that a player should never be

7

returned to play while displaying any concussion-related symptoms, and coined the phrase, "when in doubt, sit them out." *Id.*

Weston claims that the NCAA and Big Sky were in a superior position when compared to himself and other WSU football players to know about these studies, *id.* ¶¶ 32, 92, and that they have known of the harmful effects of concussions and subconcussive impacts for decades, *id.* ¶¶ 60–62. According to him, despite this knowledge, Defendants did not change their concussion management and return-to-play protocols until 2010. *Id.* ¶¶ 60, 63–64, 75, 112.

Furthermore, Weston alleges that the concussion management plan Defendants adopted in 2010 was and still is deficient. *Id.* ¶¶ 65–69. For instance, the policy places the burden on players to report symptoms of a concussion and allows players to consent to continue to play. *Id.* ¶¶ 68–69. But a concussed player may be in no condition to appreciate his symptoms or to make an informed decision about his ability to continue playing. *Id.* ¶ 69. And yet, the 2010 protocols allow a concussed player to continue playing if he does not report symptoms or consents to do so, without having received meaningful diagnosis or treatment. *Id.*

Weston asserts state common law claims of negligence (Count I), breach of express contract (Count II), breach of implied contract (Count III), breach of express contract as third-party beneficiaries (Count IV), and unjust enrichment (Count V). Big Sky has moved to dismiss the complaint for lack of personal jurisdiction. The NCAA has moved to dismiss all but the negligence claim for failure to state a claim.

## II.     Analysis

### A.     Big Sky's Motion Challenging Jurisdiction

Big Sky has moved to dismiss the complaint for lack of personal jurisdiction under Rule 12(b)(2). When a defendant makes such a motion, the plaintiff has the burden of demonstrating

personal jurisdiction over the defendant. *Purdue Research Found. v. Sanofi–Synthelabo, S.A.*, 338 F.3d 773, 782 (7th Cir. 2003). That burden, in a case where a court rules on the motion to dismiss solely based on the submission of written materials, is to "make out a prima facie case of personal jurisdiction." *Id.* (internal quotation marks omitted); *see Cent. States, Se. & Sw. Areas Pension Fund v. Reimer Express World Corp.*, 230 F.3d 934, 946 (7th Cir. 2000) ("At a minimum, the plaintiff must establish a colorable or prima facie showing of personal jurisdiction before discovery should be permitted."). "We take the plaintiff's asserted facts as true and resolve any factual disputes in its favor." *uBID, Inc. v. GoDaddy Grp., Inc.*, 623 F.3d 421, 423–24 (7th Cir. 2010).

Generally, "[a] federal district court sitting in diversity must apply the personal jurisdiction rules of the state in which it sits." *Kipp v. Ski Enter. Corp. of Wis.*, 783 F.3d 695, 697 (7th Cir. 2015). But, when a case has been transferred under 28 U.S.C. § 1407 (as this one has), the transferee judge "has all the jurisdiction and powers over pretrial proceedings in the actions transferred to him that the transferor judge would have had in the absence of transfer." *In re Testosterone Replacement Therapy Prod. Liab. Litig. Coordinated Pretrial Proceedings*, 136 F. Supp. 3d 968, 973 (N.D. Ill. 2015) (quoting *In re FMC Corp. Patent Litig.*, 422 F. Supp. 1163, 1165 (J.P.M.L. 1976)). This case was transferred by the Judicial Panel on Multidistrict Litigation to this Court from the Southern District of Indiana. *See* Conditional Transfer Order 13, ECF No. 5. And, under Indiana law, "personal jurisdiction extends to the limits allowed by the Due Process Clause of the Fourteenth Amendment." *See E&A Holdings, LLC v. Leviton Mfg. Co.*, No. 118CV02400SEBMJD, 2018 WL 6659729, at *3 (S.D. Ind. Oct. 24, 2018); Ind. Trial P. Rule 4.4(A).

It is hornbook law that two types of personal jurisdiction exist: general and specific. *Helicopteros Nacionales de Columbia, S.A. v. Hall*, 466 U.S. 408, 414–15 n.8–9 (1984). Weston

apparently concedes the absence of general jurisdiction, but argues that the Court has specific jurisdiction as to Big Sky.

"Specific personal jurisdiction is appropriate where (1) the defendant has purposefully directed his activities at the forum state or purposefully availed himself of the privilege of conducting business in that state, and (2) the alleged injury arises out of the defendant's forum-related activities." *Tamburo v. Dworkin*, 601 F.3d 693, 702 (7th Cir. 2010). "[T]he nature of the purposeful-direction/purposeful-availment inquiry depends in large part on the type of claim at issue." *Felland v. Clifton*, 682 F.3d 665, 674 (7th Cir. 2012).

To be subject to specific jurisdiction, a defendant need only have sufficient "minimum contacts with it such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945) (quoting *Milliken v. Meyer*, 311 U.S. 457, 463 (1940)). "Jurisdiction is proper . . . where the contacts proximately result from actions by the defendant himself that create a substantial connection with the forum State." *Burger King v. Rudzewicz*, 471 U.S. 462, 475 (1985) (internal quotation marks omitted). Courts look to the defendant's "conduct and connection with the forum State" to determine if he should "reasonably anticipate being haled into court there." *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980).

From 1996 to 1997, Weston, an Idaho resident, played football for WSU. Compl. ¶¶ 9, 71; Nadolski Aff. ¶¶ 7–8, ECF No. 15-1. WSU is located in Utah, and WSU has never played a football game in Indiana. Bovee Aff. ¶ 8, ECF No. 15-2. In fact, none of Big Sky's member schools have ever been located in Indiana, and Big Sky has never organized or conducted football games involving its member schools in Indiana. Nadolski Aff. ¶ 9.

During that time period, Big Sky's headquarters were located in Utah, and, thus, any communication between Big Sky and its member institutions emanated from Utah. Nadolski Aff. ¶ 5. Additionally, the NCAA's national office was located in Kansas, and any NCAA committee meetings that Big Sky representatives might have attended at the national office would have taken place in Kansas. King Aff. ¶ 9, ECF No. 45-1.

Nonetheless, Weston asserts that Big Sky is subject to specific jurisdiction in Indiana. His principal argument is that his claims are based on Big Sky's failure to warn and protect him while he was playing football and that, as a member of the NCAA, Big Sky's failure "resulted directly from NCAA regulations of Division I football conference that emanated from Indiana, and was applied by Big Sky through its members in the NCAA." Pl.'s Resp. at 8, ECF No. 36. But there is no dispute that the NCAA relocated to Indiana in 1999, and Weston does nothing to explain how anything that could have happened in Indiana after 1999 could have related to his injuries that allegedly occurred at WSU in 1996 and 1997.

What is more, Weston has not even attempted to explain how any possible contact that the Big Sky might have had with Indiana relates to the claims that he has asserted in this case. As to his contract, quasi-contract, and negligence causes of action, Weston does not argue that Big Sky did anything in Indiana that gave rise to these claims or that his alleged injuries arose out of Big Sky's forum-related activities.

Accordingly, Weston has failed to establish that a federal court in Indiana could exercise general jurisdiction or specific jurisdiction over Big Sky, and its motion to dismiss for lack of personal jurisdiction is granted. Furthermore, because Weston has failed to make a colorable showing of personal jurisdiction, his request for jurisdictional discovery is denied. *See Cent. States*, 230 F.3d at 947; *Gilman Opco LLC v. Lanman Oil Co.*, No. 13-CV-7846, 2014 WL

1284499, at *6 (N.D. Ill. Mar. 28, 2014) ("Although the standard to obtain jurisdictional discovery is low, courts will not permit discovery based only upon 'bare,' 'attenuated,' or 'unsupported' assertions of personal jurisdiction . . . .") (quoting *Andersen v. Sportmart, Inc.*, 179 F.R.D. 236, 242 (N.D. Ind. 1998)).  Big Sky is therefore dismissed as a defendant.

## B.      The NCAA's Motion to Dismiss

For its part, the NCAA has moved to dismiss Weston's contract and quasi-contract claims pursuant to Rule 12(b)(6), arguing that he has failed to adequately plead elements of these claims.

### 1.      Choice of Law

As a threshold matter, because this Court sits in diversity, it must address the question of which state's laws apply to Weston's claims.  *Heiman v. Bimbo Foods Bakeries Distrib. Co.*, 902 F.3d 715, 718 (7th Cir. 2018).  In making this determination, as a transferee court presiding over a multidistrict litigation, this Court must apply the choice-of-law rules of the transferor forum. *Chang v. Baxter Healthcare Corp*., 599 F.3d 728, 732 (7th Cir. 2010).  And, because this case was transferred from the Southern District of Indiana, *see* Conditional Transfer Order 13, Indiana's choice-of-law rules govern this analysis.  However, "it is necessary for the Court to resolve choice of law conflicts 'only when a difference in law will make a difference to the outcome[.]'" *Knox Cty. Ass'n for Retarded Citizens, Inc. v. NISH*, No. 2:11-CV-313-WTL-WGH, 2013 WL 633125, at *5 (S.D. Ind. Feb. 20, 2013) (quoting *Int'l Adm'rs v. Life Ins. Co.*, 753 F.2d 1373, 1376 n.4 (7th Cir. 1985); *see Hubbard Mfg. Co. v. Greeson*, 515 N.E.2d 1071, 1073 (Ind. 1987).

Here, the parties agree that Indiana law applies to Weston's contract claims because any conflict between Indiana and Utah law will not alter the outcome of the motion to dismiss.  *See Allen v. Great Am. Reserve Ins. Co.*, 766 N.E.2d 1157, 1162 (Ind. 2002) ("[A] choice of law issue

will be resolved only if it appears there is a difference in the laws of the potentially applicable jurisdictions.").  The Court will apply Indiana law to the contract claims

With regard to the unjust enrichment claim, however, the parties dispute whether Indiana and Utah law conflict.  Under Utah law, to succeed on an unjust enrichment claim, a plaintiff must allege (1) "a benefit conferred on one person by another;" (2) "an appreciation or knowledge by the conferee of the benefit;" and (3) "the acceptance or retention by the conferee of the benefit under such circumstances as to make it inequitable for the conferee to retain the benefit without payment of its value." *Berrett v. Stevens*, 690 P.2d 553, 557 (Utah 1984).  "A defendant is liable under the unjust enrichment prong of quantum meruit only if he or she received a direct benefit from the plaintiff." *Jones v. Mackey Price Thompson & Ostler*, 355 P.3d 1000, 1018 (Utah 2015).

Indiana law, on the other hand, requires that in order "[t]o prevail on a claim of unjust enrichment, a claimant must establish that a measurable benefit has been conferred on the defendant under such circumstances that the defendant's retention of the benefit without payment would be unjust." *Zoeller v. E. Chi. Second Century, Inc.*, 904 N.E.2d 213, 220 (Ind. 2009). Moreover, a person who "labors without an expectation of payment cannot recover." *Bayh v. Sonnenburg*, 573 N.E.2d 398, 408 (Ind. 1991); *see Biggerstaff v. Vanderburgh Humane Soc.*, 453 N.E.2d 363, 364 (Ind. Ct. App. 1983).

Thus, Indiana requires a plaintiff to have expected payment for whatever benefit he or she conferred on the recipient, whereas Utah law does not.  Because this difference could very well impact the outcome of the unjust enrichment claim, the Court must determine which state's law to apply to that claim and apply Indiana's choice-of-law rules to do so.

Indiana courts apply the "most intimate contacts" test to resolve choice-of-law issues for unjust enrichment claims, much like they do for breach of contract claims.  *See Lawrence*

13

*Wholesale, LLC v. Nicholson*, No. 4:14-CV-00017-TWP, 2015 WL 1038001, at *2 (S.D. Ind. Mar. 10, 2015). Under this test, a court considers: "(1) the place of contracting; (2) the place of negotiation of the contract; (3) the place of performance; (4) the location of the subject matter of the contract; and (5) the domicile, residence, nationality, place of incorporation and place of business of the parties." *Nat'l Union Fire Ins. Co. of Pittsburgh, PA v. Standard Fusee Corp.*, 940 N.E.2d 810, 814 (Ind. 2010).

Applying these five factors, the Court finds that, as between Indiana and Utah, Utah has the most intimate contacts with Weston's unjust enrichment claim. First, Indiana courts define the place of contracting as the place where the last act necessary to make a binding agreement occurred. *See id.* at 817 n.6. Here, Weston alleges that he accepted the implied contract by participating in WSU's football program in Utah from 1996 to 1997. *See* Compl. ¶ 111; Pl.'s Ex., Nadolski Decl. ¶ 12. Second, Weston does not allege whether or where the implied contract was negotiated, and, thus, this factor is neutral. The third and fourth factors favor the application of Utah law. Weston alleges that Utah is where he performed his obligation to play in accordance with NCAA rules and where the NCAA allegedly failed to satisfy its obligation to provide a safe environment in which to play football. *See* Compl. ¶¶ 110–13, 117, 120. Finally, the last factor leans ever so slightly in favor of applying Indiana law. Weston resides in Idaho, and the NCAA is an unincorporated association with its current place of business in Indiana.[4] *See* Compl. ¶¶ 9, 11. On balance, however, the Court concludes that, under Indiana's "most intimate contacts" test, Utah law, rather than Indiana law, applies to Weston's unjust enrichment claim.

---

[4]    *See Ram Prod. Co. v. Chauncey*, 967 F. Supp. 1071, 1081 (N.D. Ind. 1997) ("Indiana has an economic interest in the ability of companies to conduct business there."). But to the extent that Weston argues that the NCAA's enrichment from his playing football occurred in Indiana, the Court disagrees because the NCAA's place of business was located in Kansas until 1999. *See* King Aff. ¶ 5.

14

2. **Breach of Express and Implied Contract (Counts II and III)**

Turning to the claims themselves, the NCAA first argues that Weston has failed to adequately allege that it breached an express or implied contract. "The elements of a breach of contract claim are the existence of a contract, the defendant's breach, and damages to the plaintiff." *WESCO Distrib., Inc. v. ArcelorMittal Ind. Harbor LLC*, 23 N.E.3d 682, 695 (Ind. Ct. App. 2014). It bears noting, however, that "there is no federal pleading requirement that a written contract be appended to a complaint nor is there any requirement that it be directly quoted." *Evan Law Grp. LLC v. Taylor*, No. 09 C 4896, 2010 WL 5135904, at *6 (N.D. Ill. Dec. 9, 2010). Instead, "a party must allege the facts from which the legal conclusion that a contract existed may be drawn- specifically, an offer, acceptance of the offer, and consideration." *C.I. Spataro Napoli, S.A. v. Fashion Concepts, Inc.*, No. 12-80885-CV, 2012 WL 12862817, at *1 (S.D. Fla. Dec. 20, 2012).

Implied contracts are different from express contracts. An implied contract is "not created or evidenced by the explicit agreement of the parties." *Wayt v. Town of Crothersville*, 866 F. Supp. 2d 1008, 1018–19 (S.D. Ind. 2012). Rather, an implied contract is "inferred by the law, as a matter of reason and justice from [the parties'] acts or conduct, [with] the circumstances surrounding the transaction making it a reasonable, or even a necessary, assumption that a contract existed between them by tacit understanding." *Id.* To state a claim of breach of implied contract under Indiana law, a plaintiff cannot merely allege that "he had a contract with the defendant, gave the defendant consideration, and the defendant breached the contract." *Bissessur v. Ind. Univ. Bd. of Trs.*, 581 F.3d 599, 603 (7th Cir. 2009). Instead, to withstand a motion to dismiss, "a claim of breach of implied contract requires facts concerning the promises allegedly made by the parties to the contract, how those promises were communicated and how the exchange of obligations created an

15

implied contract." *Robinson v. Leonard-Dent*, No. 3:12CV417-PPS, 2013 WL 5701067, at *13 n.5 (N.D. Ind. Oct. 18, 2013); *see Bissessur*, 581 F.3d at 603.

In the NCAA's view, Weston offers only legal conclusions and scant factual allegations to support his express and implied contract claims. But a review of the complaint refutes this argument.

In the complaint, Weston alleges that, in order to play football for WSU, he was required to enter into a written agreement with the NCAA that he would comply with the NCAA's Constitution, bylaws, and regulations. Compl. ¶¶ 100, 104. In exchange, he states, the NCAA promised to conduct football in a manner designed to protect players' physical wellbeing and to require WSU to protect their health and safety as well. *Id.* ¶ 101. Weston alternatively asserts that, in the absence of an express contract, the NCAA's conduct, as well as the many statements in its Constitution, bylaws, rules and regulations, evinced its assent to enter into an implied agreement with Weston to safeguard his health if he agreed to play football at WSU and follow the NCAA's guidelines. *Id.* ¶ 110. According to Weston, he fulfilled his obligations under either the express or implied agreement, *id.* ¶¶ 105, 111, while the NCAA breached its promises to him, *id.* ¶¶ 73–76, 103, 112, causing him great suffering and pain, *id.* ¶¶ 77, 106–07, 113–14.

Assuming the truth of these allegations and construing all reasonable inferences in Weston's favor, the Court concludes that Weston has pleaded claims for breach of express and implied contract sufficiently to defeat a motion to dismiss under Rule 12(b)(6). The NCAA's motion to dismiss these claims is denied.

### 3. Breach of Express Contract as a Third-Party Beneficiary (Count IV)

In addition, Weston asserts that he was a third-party beneficiary to a written contract between the NCAA and WSU, and that the NCAA has breached that contract, thereby damaging him.  A third-party beneficiary may enforce a contract by establishing:

> (1) a clear intent by the actual parties to the contract to benefit the third party; (2) a duty imposed on one of the contracting parties in favor of the third party; and (3) performance of the contract terms is necessary to render the third party a direct benefit intended by the parties to the contract.

*Alexander v. Linkmeyer Dev. II, LLC*, 119 N.E.3d 603, 613 (Ind. Ct. App. 2019) (internal quotation marks and citations omitted).  "Among these three factors, the intent of the contracting parties to benefit the third-party is controlling."  *Flaherty & Collins, Inc. v. BBR-Vision I, L.P.*, 990 N.E.2d 958, 971 (Ind. Ct. App. 2013).  "However, it is not necessary that the intent to benefit a third party be demonstrated any more clearly than the parties' intent regarding any other terms of the contract."  *OEC-Diasonics, Inc. v. Major*, 674 N.E.2d 1312, 1315 (Ind. 1996).  Such intent is "established from the manifestations of the parties as exhibited by the terms of the written [contract] and testimony related thereto.'"  *Wecker v. Kilmer*, 294 N.E.2d 132, 135 (Ind. 1973) (internal quotation marks omitted).  Intent may be shown by naming a specific person or class of persons or "by other evidence demonstrating the intent or understanding of the parties."  *Mogensen v. Martz*, 441 N.E.2d 34, 35 (Ind. Ct. App. 1982).

The NCAA argues that Weston has failed to allege the existence of a contract between it and WSU and that he merely points to evidence outside of the contract to establish intent.  The Court disagrees.

Weston alleges that the NCAA and WSU entered into a written agreement by which the NCAA agreed to promulgate rules and regulations, including those set forth in the NCAA's

Division Manuals, Constitution, and Bylaws, to protect the safety and physical well-being of each student-athlete. *See* Compl. ¶¶ 116–18. In exchange, WSU agreed to abide by and enforce those rules in order to protect the health of each student-athlete. *Id.* The terms of this agreement, as alleged in the complaint, expressed specific commitments by the NCAA and WSU in the regulation of WSU's football program to safeguard the mental and physical well-being of its football players like Weston. *See id.* ¶¶ 116–19. Accordingly, the NCAA's motion to dismiss Weston's third-party beneficiary contract claim is denied.

### 4.    Unjust Enrichment in the Alternative to Breach of Contract (Count V)

Finally, the NCAA moves to dismiss Weston's unjust enrichment claim (which he pleads in the alternative to his breach-of-contract claims). To survive, Weston is required to have alleged: "(1) a benefit conferred on one person by another; (2) an appreciation or knowledge by the conferee of the benefit; and (3) the acceptance or retention by the conferee of the benefit under such circumstances as to make it inequitable for the conferee to retain the benefit without payment of its value." *See Berrett*, 690 P.2d at 557.

The NCAA solely attacks the first element, arguing that Utah law will recognize an unjust enrichment claim only if the plaintiff "received a direct benefit from the plaintiff." *Jones v. Mackey Price Thompson & Ostler*, 355 P.3d 1000, 1018 (Utah 2015). In support, it relies on *Jones*, 355 P.3d at 1018–19, and *Simons v. Park City RV Resort, LLC*, 354 P.3d 215, 222 (Utah Ct. App. 2015). However, the caselaw is not that straightforward.

In *Jones*, a law partner sued his former firm and partners for unjust enrichment based on their failure to compensate him for origination fees. 355 P.3d 1006–07. As to the unjust enrichment claim, the trial court granted summary judgment in favor of the plaintiff's former partners and denied the motion as to his former law firm because the firm was the only defendant

that directly benefited from the plaintiff's work. *Id.* at 1007. Plaintiff appealed, and the Utah Supreme Court affirmed summary judgment in favor of the former individual partners because, even when the disputed facts were viewed in a light most favorable to plaintiff, his direct contractual agreements were with the law firm, not the individual partners. *Id.* at 1004.

In *Simons*, a home buyer sued a home construction company and its president for unjust enrichment. 354 P.3d at 222–23. The Court of Appeals of Utah affirmed the summary judgment granted by the trial court in the president's favor because the undisputed evidence showed that the plaintiff had made all payments to the construction company, not the president, and because the plaintiff had failed to create a genuine dispute of material fact as to whether the president had inequitably benefited from any overpayment to the construction company. *Id.*

Although *Jones* and *Simons* illustrate the direct benefit principle, they were decided at the summary judgment stage and are not entirely helpful here. More apropos are cases decided at the pleading stage, such as *Desert Miriah, Inc. v. B&L Auto, Inc.*, 12 P.3d 580, 583 (Utah 2000); *Springfield Fin. v. Lilley*, No. 2:14-CV-00679-EJF, 2016 WL 4275642, at *3–4 (D. Utah Aug. 12, 2016); and *DiTucci v. Ashby*, No. 2:19-CV-277-TC, 2019 WL 2579268, at *5–6 (D. Utah June 24, 2019).

In *Desert Miriah*, after a tangled web of loan transactions, a creditor sued a houseboat corporation for unjust enrichment to recover a $50,000 loan made to a third party in connection with the corporation's purchase of a houseboat. 12 P.3d at 583. Although the Utah Supreme Court affirmed the dismissal of the unjust enrichment claim for other reasons, it rejected the houseboat corporation's argument that it did not receive a benefit when the creditor made the $50,000 loan to the third party. *Id.* Instead, the court held that the houseboat corporation benefited because, without the loan, another entity could have seized the houseboat to satisfy an unpaid note. *Id.*

19

("The benefit to plaintiff in this case was not so far removed from [defendant's] actions as to find that [defendant] did not confer a benefit on plaintiff in making the loan").[5]

Likewise, in *Springfield Finance*, a plaintiff financial institution sued Barbara Lilley, the managing director of an investment firm, for unjust enrichment after Lilley allegedly bamboozled plaintiff into funding overseas investments and siphoned some of the funds for her personal use. 2016 WL 4275642, at *3–4. Lilley moved to dismiss the unjust enrichment claim and argued that the plaintiff had failed to allege that she personally received any money directly from plaintiff. *Id.* at *3. The district court denied the motion, noting that "[e]ven though Ms. Lilley did not receive the funds directly from Springfield, she could only siphon the funds and incur a personal benefit because Springfield made the investments." *Id.* at *4.

Similarly, in *DiTucci*, individual investors sued various interrelated entities and individuals for unjust enrichment, alleging they were victims of the defendants' fraudulent investment scheme. 2019 WL 2579268, at *1. One of the individual defendants, William Bowser, moved to dismiss the complaint, contending that the plaintiffs had not conferred a benefit on him, because they had paid one of the interrelated entities and not him. *Id.* at *5. Observing that Bowser's argument was "based on an unnecessarily strict reading of the element, the court allowed the unjust enrichment to proceed, noting "the multi-part nature of the . . . investment [structure]" and "the fluidity of transactions and links between [the interrelated entities]." *Id.*

---

[5] That said, "[t]he mere fact that a third person benefits from a contract between two others does not make such third person liable in quasi-contract, unjust enrichment, or restitution." *Commercial Fixtures & Furnishings, Inc. v. Adams*, 564 P.2d 773, 774 (Utah 1977). Rather, "[t]here must be some misleading act, request for services, or the like, to support such an action. Mere failure of performance by one of the contracting parties does not give rise to a right of restitution." *Id.*

20

Here, Weston alleges that the NCAA benefited from his play by receiving revenues from broadcasting rights, merchandising agreements, and tickets sales. *See* Compl. ¶¶ 124–27. In turn, the NCAA argues that any benefit that it received from Weston's play was too attenuated to satisfy the direct benefit requirement espoused in *Jones*. But, at this early stage in the litigation when all allegations and reasonable inferences drawn therefrom are construed in Weston's favor, the Court is not prepared to hold, as a matter of law, that the NCAA's merchandising, broadcasting, and ticket revenues were too far removed from Weston's actions to require dismissal of this claim. *See* Compl. ¶¶ 124–26. Accordingly, Weston will be allowed to pursue discovery regarding the nature of the revenue structure and the transactions and links between the interrelated entities that connect his football play and any benefits the NCAA may have received from it. *See Rawlings v. Rawlings*, 240 P.3d 754, 766 (Utah 2010) (holding that "determining whether circumstances surrounding the parties' interactions [a]re inequitable is a fact-intensive process"). The NCAA's motion to dismiss Count VI is denied.

### III.    Conclusion

For the reasons provided above, Big Sky's motion to dismiss is granted, and the NCAA's motion to dismiss is denied.

**IT IS SO ORDERED.**                  **ENTERED  6/12/20**

                                                        _____
                                                        **John Z. Lee**
                                                        **United States District Judge**